UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| JAMES R. MAY, | ) ) ) | |
| Plaintiff, | ) ) | No. 5:21-CV-182-DCR-HAI |
| v. | ) ) ) | RECOMMENDED DISPOSITION |
| DANIEL AKERS, *et al.*, | ) ) ) | |
| Defendant. | ) ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

*Pro se* Plaintiff James May is a prisoner at the Little Sandy Correctional Complex in Sandy Hook, Kentucky, but was formerly confined at the Lee Adjustment Center ("LAC") in Beattyville, Kentucky. On June 29, 2021, the Clerk docketed a complaint by May against several staff members at LAC in their individual and official capacities. D.E. 1. On October 15, 2021, Chief Judge Reeves granted May's motion for leave to file an amended complaint. D.E. 43. On December 14, 2021, Chief Judge Reeves granted May's second motion to amend his complaint and granted the motion to dismiss claims against Defendant Brian Kendrick. D.E. 55. As a result, May's Second Amended Complaint (D.E. 56) became the operative pleading in this matter and Kendrick was dismissed as a defendant in this action. *Id.*

May brings a number of claims pursuant to 42 U.S.C. § 1983, as well as state law claims, all stemming from an incident that occurred on June 26, 2020, at the LAC when a chair May was sitting in allegedly collapsed and caused him to sustain injuries. May's remaining claims against Nurse Practitioner Joyce Puckett are Eighth Amendment claims of deliberate indifference to his

medical needs and state law claims of medical malpractice, all related to his medical treatment after the accident.

May was deposed on June 1 and 14, 2022, and the transcript is filed at Docket Entry 100. On November 14, 2022, Puckett filed a motion for summary judgment (D.E. 97). May responded (D.E. 101), and Puckett replied (D.E. 106). The briefings also include multiple attachments, such as affidavits and medical records. Puckett's motion for summary judgment stands ripe for review.

## I. Factual Background

On June 26, 2020, May was confined at the LAC. D.E. 100-1 at 8. Around 6:15 a.m., while using a kiosk in the canteen, the leg of the chair May was sitting in collapsed. *Id.* at 22. May landed on and injured his shoulder. *Id.* May requested to go to medical, but Officer Crystal Justice instructed him to go to sick call. *Id.* at 23.

May attended sick call when it began at about 7:00 a.m. D.E. 100-1 at 226, 100-3 at 54. May was first seen by Nurses Chaney and Freeman. D.E. 100-1 at 227-28, D.E. 100-3 at 54. They referred May to Defendant Puckett for immediate evaluation. D.E. 100-1 at 229, D.E. 100-3 at 54. May was given an ice pack and sling for his shoulder. D.E. 100-1 at 238-39, D.E. 100-3 at 52, 54. May had taken 975 milligrams of Tylenol and 400 milligrams of ibuprofen prior to attending sick call. D.E. 100-3 at 52, 100-1 at 241-43. Puckett prescribed May a 30-day supply of ibuprofen and 3-day supply of Tramadol and administered at least one pain injection. D.E. 100-3 at 52. Puckett referred May for an x-ray as soon as possible and advised him to use ice packs and wear his sling at all times. D.E. 100-1 at 253, D.E. 100-3 at 52.

May was seen again on July 1, 2020, by Puckett and an x-ray technician. D.E. 100-3 at 56. May reported "horrible" pain and difficulty dressing. *Id.* The x-ray technician "could not

2

finish the study related to a fracture and the patient's inability to raise his arm." *Id.* This fracture was of the "humeral head with displacement." *Id.* May was not wearing his sling during the appointment. *Id.* The treatment notes from that visit indicate:

> Fracture seen on imaging per provider. Will consult Dr[.] Clifford for referral to orthopedics. Continue all other plan of care and medication at this time. Sling is to be worn at all times. Knock off for meal delivery given to patient. Refused to stay in medical at this time. Will follow up after consult. Consulted Dr[.] Clifford ok to send out for ortho referral and to exp[e]dite the consultation.

*Id.* The "knock off for meal delivery" allowed May's meal to be brought to his bed area. D.E. 100-1 at 265. On July 2, May refused to stay in the medical area for observation and assistance with activities of daily living. D.E. 100-3 at 58. The refusal form states, "No treatment offered – same as in dorm. Only refusing bed at medical." D.E. 101-15.

On July 6, 2020, May was seen by Puckett regarding left shoulder pain. D.E. 96 at 9. May was not wearing his sling and Puckett advised him to wear it. *Id.* May again refused to stay in the medical department. *Id.*

May was then seen on July 7 by Dr. Primm at UK HealthCare. D.E. 100-3 at 61. At that time, Dr. Primm noted he anticipated "nonoperative management," provided May with a cuff-and-collar sling, and scheduled a follow-up appointment three weeks later. *Id.* at 62.

On July 7, May returned to the medical department requesting that his meals be delivered and for a uniform pass to wear sweatpants. D.E. 96 at 13. Nurse Craft consulted Puckett, who granted the meal delivery request, but denied the uniform pass. *Id.* May was scheduled for a follow-up appointment with Puckett a week later. *Id.*

Puckett ordered ibuprofen and meloxicam for May on July 14. D.E. 96 at 14-15. On July 16, Puckett granted May's request to extend his meal deliveries and recommended continuation of his current care and medications. *Id.* at 16. Puckett noted May was not wearing

his sling, and he reported that "the doctor told him not to wear it at all times because he did not want his muscles to freeze." *Id.*

May was seen again by Dr. Primm on August 4, 2020. D.E. 100-3 at 63. May reported improved, yet continued, pain his left shoulder and that he had "continued to perform range-of-motion exercises at the elbow and or shoulder." *Id.* May further reported that he had "minimal use of the cuff and collar sling" and that most of his pain occurred at night "when rolling over in bed." *Id.* May denied "any numbness or tingling in the upper extremity" or any other complaints at that time. *Id.* May's left shoulder was x-rayed again, which demonstrated "continued callus formation and healing of the proximal humerus fracture with appropriate bony alignment." *Id.* Dr. Primm recommended Tylenol and ibuprofen for pain and continued various exercises for his shoulder and elbow. *Id.* A follow-up appointment was scheduled for six weeks later. *Id.*

On August 7, May submitted a request for additional medication and another extension to his meal deliveries. D.E. 96 at 20. May was seen on August 7 by Nurse Chaney, who prescribed ibuprofen and referred him to see Puckett. *Id.* at 63. On August 13, Puckett reported that May was again not wearing his sling and prescribed additional ibuprofen and extended his meal delivery by four more weeks. *Id.* at 21.

May was next seen by Dr. Primm on September 29, 2020. D.E. 96 at 23, D.E. 98-10 at 6, D.E. 100-1 at 296, 100-3 at 66. During that visit, May reported that his pain was much better and that he had continued range-of-motion exercises, though his left shoulder was still stiff. D.E. 98-10 at 6. Based on additional x-rays, Dr. Primm reported the fracture appeared healed. *Id.* Dr. Primm referred May for physical therapy, scheduled a follow-up appointment for six weeks later, and noted no additional x-rays would be needed. *Id.* Puckett referred May for physical

4

therapy on October 12. D.E. 96 at 64.[1] On November 5, May refused to participate in physical therapy. D.E. 96 at 65.

May was transferred to the Southeast State Correctional Complex in January 2021 and then to the Little Sandy Correctional Complex in April 2022. *Id.* at 47, 66.

## II. Legal Standards—Summary Judgment

Defendant Puckett has moved for summary judgment under Rule 56 and relies upon documents and declarations extrinsic to the pleadings. Fed. R. Civ. P. 12(d). A motion under Rule 56 challenges the viability of the other party's claim by asserting that at least one essential element of that claim is not supported by legally sufficient evidence. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). If the moving party demonstrates that there is no genuine dispute as to any material fact and that he is entitled to a judgment as a matter of law, he is entitled to summary judgment. *Kand Med., Inc. v. Freund Med. Prods., Inc.*, 963 F.2d 125, 127 (6th Cir. 1992).

The moving party does not need his own evidence to support this assertion, but need only point to the absence of evidence to support the claim. *Turner v. City of Taylor*, 412 F.3d 629, 638 (6th Cir. 2005). The responding party cannot rely upon allegations in the pleadings, but must point to evidence of record in affidavits, depositions, and discovery which demonstrates that a factual question remains for trial. *Hunley v. DuPont Auto*, 341 F.3d 491, 496 (6th Cir. 2003). "A trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to 'wade through' the record for specific facts." *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).

---

[1] During the deposition, counsel read this information from one of the September 29 medical records, and May confirmed its accuracy. D.E. 100-1 at 295-98. The deposition transcript indicates that this document was marked as Puckett Exhibit 8. *Id.* at 298. While Exhibit 8 is mostly illegible, this same document can be found in a more legible form on page 23 of Docket Entry 96. Exhibit 8 only includes findings from the September 29 x-rays, and does not include the information May reported to Dr. Primm. The Court's review of the record indicates that the medical document containing the information referred to as Exhibit 8 is located at Docket Entry 98-10 at 6.

The Court reviews all of the evidence presented by the parties in a light most favorable to the responding party and draws all reasonable factual inferences in his favor. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). The Court must grant summary judgment if the evidence would not support a jury verdict for the responding party with respect to at least one essential element of his claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). If the applicable substantive law requires the responding party to meet a higher burden of proof, that party's evidence must be sufficient to sustain a jury's verdict in his favor in light of that heightened burden of proof at trial. *Harvey v. Hollenback*, 113 F.3d 639, 642 (6th Cir. 1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993).

### III. Medical Malpractice

Under Kentucky negligence law, including medical negligence, the Plaintiff must establish the following elements: (1) a duty of care; (2) breach of that duty; (3) actual injury, and (4) the injury was proximately caused by the negligence. *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 687-88 (Ky. 2003), *as amended* (Aug. 27, 2003); *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1997).

"Under Kentucky law, a plaintiff alleging medical malpractice is generally required to put forth expert testimony to show that the defendant medical provider failed to conform to the standard of care." *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2010); *accord Green v. Owensboro Med. Health Sys., Inc.*, 231 S.W.3d 781, 783 (Ky. Ct. App. 2007). "[T]he plaintiff in a medical negligence case is required to present expert testimony that establishes (1) the standard of skill expected of a reasonably competent medical practitioner and (2) that the alleged negligence proximately caused the injury." *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006). The expert's opinion must be based "on reasonable medical probability and not

6

speculation or possibility." *Sakler v. Anesthesiology Associates, P.S.C.*, 50 S.W.3d 210, 213 (Ky. Ct. App. 2001).

To be clear, meeting this standard requires that the expert establish the applicable standard of care. "To establish a prima facie case of medical malpractice, a plaintiff must introduce evidence, *in the form of expert testimony*, demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant . . . ." *Sandler v. United States*, No. 6:11-CV-206-GFVT, 2013 WL 5468493, at *6 (E.D. Ky. Sept. 30, 2013) (quoting *Heavrin v. Jones*, No. 02-CA-16-MR, 2003 WL 21673958, at * 1 (Ky. Ct. App. July 18, 2003)). "It is the Plaintiff's burden to find a doctor who will testify to the standard of treatment of each condition and testify that in his or her expert opinion, the standard was breached by the federal employee(s) in this case." *Id*. (quoting *Hernandez v. United States,* No. 5:08-CV-195-KSF, 2009 WL 1586809, at *6 (E.D. Ky. June 5, 2009)).[2]

Exceptions to this expert-testimony rule exist, including "*res ipsa loquitur* cases" and cases where the physician sufficiently admits negligence. *Blankenship*, 302 S.W.3d at 670. Here, May appears to argue that the *res ipsa loquitur* exception should apply, but this is not the case of a surgeon leaving a scalpel in, or removing or injuring an inappropriate part of, a patient's body. *Phillips v. Tangilag*, 14 F.4th 524, 540 (6th Cir. 2021); *White v. Norton Healthcare, Inc.*, 435 S.W.3d 68, 76-77 (Ky. Ct. App. 2014). An alleged poor result by itself

---

[2] *See also Partin v. Tilford*, No. 5:13-CV-193-CRS, 2016 WL 3212248, at *2 (W.D. Ky. June 7, 2016) (granting summary judgment when plaintiff failed to establish "what a proper [treatment] entails"); *Smith v. Rees*, No. 5:07-CV-180-TBR, 2011 WL 3236635, at *3 (W.D. Ky. July 28, 2011) (requiring expert testimony to establish the standard of care); *Beard v. United States*, No. 5:08-CV-105-KSF, 2009 WL 305893, at *7-9 (E.D. Ky. Feb. 6, 2009) (granting summary judgment when plaintiff offered no expert proof establishing the standard of care); *Hitch v. St. Elizabeth Med. Ctr., Inc.*, No. 2014-CA-1361-MR, 2016 WL 1557734, at *2 (Ky. Ct. App. Apr. 15, 2016) (granting summary judgment when the expert "made no statement to indicate what the standard of care is"); *Tackett v. Appalachian Reg'l Healthcare, Inc.*, No. 2007-CA-720-MR, 2008 WL 2779528, at *2-4 (Ky. Ct. App. July 18, 2008) (granting summary judgment when the plaintiff's expert "failed to produce evidence as to the medical standard of care at issue").

Case: 5:21-cv-00182-DCR-HAI Doc #: 111 Filed: 03/02/23 Page: 8 of 17 - Page ID#: 1977

does not amount to a *res ipsa loquitur* case. *Phillips*, 14 F.4th at 540 (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992)). This expert-testimony exception does not apply to the present case.

May has also attached an "Affidavit of Merit Pursuant to KRS 411.167" to his response. D.E. 101-30. Ky. Rev. Stat. § 411.167 requires claimants who commence medical malpractice actions to file a certificate of merit with their complaints. Ky. Rev. Stat. § 411.167(1). However, contrary to May's assertions, this statute does not provide claimants an exception to the expert-testimony rule. Though May has "certified" his belief that he does not need an expert to prove his medical malpractice claims, Kentucky law clearly requires otherwise. *Sandler*, 2013 WL 5468493, at *6 (quoting *Heavrin*, 2003 WL 21673958, at * 1).

May has presented no expert testimony, as required by Kentucky law, to establish either the applicable standard of care or that it was breached. Thus, Puckett is entitled to judgment as a matter of law on this claim.

## IV. Deliberate Indifference to Serious Medical Needs

The Eighth Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward [his] serious medical needs." *Blackmore v. Kalamazoo County*, 390 F. 3d 890, 895 (6th Cir. 2004) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff asserting deliberate indifference to his serious medical needs must establish both the objective and subjective components of such a claim. *Jones v. Muskegon Co.*, 625 F.3d 935, 941 (6th Cir. 2010). The objective component requires the plaintiff to show that the medical condition is "sufficiently serious," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), such as one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity

8

for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citations omitted). The subjective component requires the plaintiff to show that prison officials actually knew of a substantial risk of harm to the plaintiff's health but consciously disregarded it. *Cooper v. County of Washtenaw*, 222 F. App'x 459, 466 (6th Cir. 2007); *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994).

Where, as here, a prisoner receives treatment and challenges its adequacy, a heightened showing must be made that the treatment was "'so grossly incompetent' or so grossly 'inadequate' as to 'shock the conscience' or [would] 'be intolerable to fundamental fairness.'" *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)). "For prisoners to prove grossly inadequate care, moreover, courts generally require them to introduce medical evidence, typically in the form of expert testimony." *Id.* (citing *Rhinehart*, 894 F.3d at 737, 740-43; *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)). Similarly, where there is a delay in care, a plaintiff "need[s] to 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Id.* at 538 (quoting *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)).

Here, May argues that he repeatedly requested to go to the hospital for treatment of his injuries, but Puckett denied his requests. As previously discussed, May has not established that Puckett was medically negligent. And "deliberate indifference describes a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). It is well-established that "mere negligence or malpractice is insufficient to establish an Eighth Amendment violation." *Robbins v. Black*, 351 F. App'x 58, 62 (6th Cir. 2009) (quoting *Bowman v. Corrections Corp. of America*, 350 F.3d 537, 544 (6th Cir.2003)).

9

"Negligence in diagnosing a medical condition does not constitute unconstitutional deliberate indifference." *Jones v. Muskegon Cty.*, 625 F.3d 935, 945 (6th Cir. 2010) (quoting *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009)); *see also Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012) ("Deliberate indifference is characterized by obduracy or wantonness—it cannot be predicated on negligence, inadvertence, or good faith error."); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995). If May cannot even establish negligence (for the reasons discussed above), he cannot establish deliberate indifference, which is a higher standard of culpability.

Moreover, just as with his medical negligence claim, May has not provided any expert testimony or other medical evidence to show he received grossly inadequate care. May argues that he is not required to provide such evidence to satisfy the objective prong of his deliberate indifference claim because his injury was obvious. May relies on several cases, mostly out-of-circuit, to support this assertion, but each is distinguishable from the present matter. *Petrichko v. Kurtz*, 117 F. Supp. 2d 467 (E.D. Pa. 2000) (inmate received no care from non-medical prison staff); *Higgins v. Corr. Med. Servs. of Illinois, Inc.*, 178 F.3d 508, 511 (7th Cir. 1999) (no treatment received and undisputed serious medical need); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (deliberate indifference claim against non-medical prison staff for complete denial of care); *Harris v. Coweta Cnty.*, 21 F.3d 388, 390 (11th Cir. 1994) (analyzing qualified immunity of non-medical prison staff); *Jones v. Pramstaller*, 678 F. Supp. 2d 609, 617 (W.D. Mich. 2009) (Defendants conceded plaintiff established objective prong).

Further, the Sixth Circuit's holding in *Phillips v. Tangilag* addressed May's precise argument:

> In response, Phillips argues that our cases did not require him to present expert testimony because he had an "obvious" need. *See Blackmore v. Kalamazoo*

> *County*, 390 F.3d 890, 897–900 (6th Cir. 2004). He places undue reliance on *Blackmore*. It asked only whether a prisoner must present "verifying medical evidence" (e.g., expert testimony) to show a serious medical need. *Id.* at 893 (quoting *Napier*, 238 F.3d at 742). We have held that obviously serious problems—such as the *Blackmore* prisoner's sharp stomach pain and vomiting over two days—do not require this evidence. *See id.* at 894, 897–98. And we have contrasted these problems with the "minor or non-obvious" maladies that do. *Santiago*, 734 F.3d at 590 (citation omitted).
>
> This debate over how to prove a "serious medical need" is beside the point. We can assume that the mass on Phillips's leg showed that need. Unlike in this case, no treatment decisions were at issue in *Blackmore*. There, the prisoner sued sheriff's deputies who did not seek medical intervention despite his severe pain. *Blackmore*, 390 F.3d at 893 n.1, 894. We held that a jury could find it "obvious" that these (non-medical) deputies should have requested medical help sooner. *Id.* at 900. (When they did, a nurse diagnosed appendicitis and sent the prisoner to surgery. *Id.*) In this case, by contrast, Phillips received substantial care and challenges the medical judgments of medical professionals. Our cases require expert testimony for this different type of challenge—as *Blackmore* recognized. *Id.* at 898; *see also Anthony*, 701 F. App'x at 464.
>
> Phillips counters that our cases also do not require medical evidence to prove the objective element of a deliberate-indifference claim if a prisoner receives such "cursory" treatment that it effectively amounts to no care. *Rhinehart*, 894 F.3d at 737 (citation omitted). Yet medical staff examined Phillips's leg, provided a slew of diagnostic tests, identified the source of the problem, sent him to a specialist, and determined that the problem would resolve on its own. When staff were informed that it had not done so, they provided more care. An ultrasound found nothing extraordinary. Medical staff then put Phillips in physical therapy and gave him pain medication. This treatment cannot be described as "cursory."

*Phillips*, 14 F.4th at 537.

Similarly, May's treatment here was not "cursory." May was referred to sick call after his injury. There, he was seen by two nurses and Nurse Practitioner Puckett. May received a sling, ice packets, pain medication, including an injection, and a referral for an x-ray as soon as possible.[3] The LAC did not have an x-ray on site, but a vendor brought one to the facility on a

---

[3] May asserts that the portion of the medical record indicating that he was given a pain injection is fabricated. He also alleges that many of the other medical records from the LAC and UK HealthCare contain false information. However, May provides nothing more than his bare assertions and conclusory allegations that staff at the LAC and UK HealthCare fabricated his medical records, which are insufficient to survive a motion for summary judgment.

regular schedule. D.E. 97-3 at 3. May was then x-rayed on July 1, which revealed an unspecified humerus fracture. D.E. 100-3 at 56. May was not wearing his sling and refused to stay in the medical area. *Id.* Puckett consulted Dr. Clifford, who approved a referral to an orthopedic specialist and for the consultation to be expedited. *Id.* Puckett ordered that "all other plan of care and medication" be continued and that his meals be delivered to his dorm. *Id.*

On July 2, May was called to the medical department to stay for observation and for assistance with activities of daily living and pain management. D.E. 100-3 at 58. He was again not wearing his sling and declined to stay in medical. *Id.*

On July 6, 2020, May was seen by Puckett regarding left shoulder pain. D.E. 96 at 9. May was again not wearing his sling, and Puckett advised him to wear it. *Id.* May again declined to stay in the medical department. *Id.* May asserts he refused because the nurses would not help him dress. D.E. 100-1 at 269-270.

On July 7, Dr. Primm anticipated nonoperative management and provided May with a cuff-and-collar sling. D.E. 100-3 at 61-62. On August 4, Dr. Primm noted improvement in May's pain and range of motion and recommended continued use of Tylenol and ibuprofen for pain and exercises. D.E. 100-3 at 63. Dr. Primm also noted May's report of having "minimal use of the cuff and collar sling." *Id.* Nurses Chaney and Craft provided May with canteen passes to allow him to purchase ibuprofen and Tylenol on July 24 and August 7. D.E. 101-17, 18. On September 29, May reported to Dr. Primm that his pain was much better and that he had continued range-of-motion exercises, though his left shoulder was still stiff. D.E. 98-10 at 6. Based on additional x-rays, Dr. Primm reported the fracture appeared healed. *Id.* Dr. Primm

---

*Hood v. Moore*, Civil Action No. 18-124-GFVT-CJS, 2021 WL 5218535, at *13 (E.D. Ky. Aug. 20, 2021) (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008)) (However, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would [permit] a finding in [his] favor on more than speculation, conjecture, or fantasy.") (alteration in original), *report and recommendation adopted*, Civil No. 7:18-cv-124-GFVT-CJS, 2021 WL 4035004 (E.D. Ky. Sept. 3, 2021), *appeal dismissed*, No. 21-5912, 2022 WL 899295 (6th Cir. Jan. 5, 2022)

recommended physical therapy, scheduled a follow-up appointment for six weeks later, and noted no additional x-rays would be needed. *Id.*

May has not provided any expert testimony or other verifying medical evidence that not taking him to the hospital at any point in time amounted to grossly inadequate treatment.

May also argues that he was deprived of physical therapy as recommended by Dr. Primm on September 29, 2020.[4] D.E. 101-19. May relies upon four letters he wrote to staff inquiring when he would receive physical therapy. D.E. 53-11-13, 19. Three of the letters are dated October 23, 2020. D.E. 53-11-13. May also attached three contact forms from October 8, October 19, and November 2 that he sent to Puckett requesting physical therapy.[5] D.E. 101-20. However, on October 12, Puckett referred May for physical therapy. D.E. 96 at 64.

May refused to participate in physical therapy on November 5. *Id.* at 65. The refusal of care form, which was not completed by Puckett, states that May "didn't want to wait," was "hurting too bad," and "had been [t]here long enough." *Id.* May alleges that this form is

---

[4] Puckett also argues that, to the extent May alleges a separate and distinct deliberate indifference claim related to physical therapy, he failed to exhaust available administrative remedies. D.E. 97 at 6. Puckett argues that May failed to file any grievance regarding a failure to receive physical therapy ordered by Dr. Primm on September 29, 2020. D.E. 97 at 7. In response, May argues that he attempted to file a grievance related to his physical therapy against Puckett on October 20, 2020. D.E. 101 at 13. May asserts that Marcia Fugate, the LAC grievance coordinator, told him that he could not file another grievance against Puckett related to the denial of treatment for his shoulder. *Id.*

    Exhaustion of administrative remedies is mandatory under the Prison Litigation Reform Act of 1995 ("PLRA") for any lawsuit challenging prison conditions. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). "There is no question that . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). It is not the prisoner's threshold burden to prove exhaustion; rather lack-of-exhaustion is an affirmative defense. *Id.* Once raised, the prisoner bears the burden of demonstrating proper exhaustion. And summary judgment is appropriate if the defendant can establish the absence of a "genuine dispute as to any material fact" regarding non-exhaustion. *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

    Prisoners must exhaust all "available" remedies—not just those that meet federal standards. *Woodford*, 548 U.S. at 85. "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Id.* at 87 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. It is the prison's requirements, not the PLRA, that define the boundaries of proper exhaustion. *Jones*, 549 U.S. at 218.

    However, in light of the recommendation of the undersigned that Puckett be granted summary judgment on other grounds, which are firm, the Court sees no reason to delve into the issue of whether May has exhausted his administrative remedies as to any claims related to physical therapy.

[5] Although four forms are attached, the fourth form appears to be a duplicate of the third. D.E. 101-20 at 3-4.

fabricated. Again, he provides nothing more than his bare assertions and conclusory allegations of fabricated records, which is insufficient at this stage. *Hood*, 2021 WL 5218535, at *13. Moreover, May has failed to provide any medical evidence to establish a detrimental effect from a delay in physical therapy.[6] *Phillips*, 14 F.4th at 538. In his response to the co-defendants' motion for summary judgment, May asserts that Puckett intentionally denied him physical therapy based on the report of Dr. Gary T. Bray, which is attached to the co-defendants' separate motion for summary judgment (D.E. 98-12). Dr. Bray reviewed May's medical records and opined, "The treatment does not seem delayed; however, it appears physical therapy was not followed up on because of [May's] recalcitrance." D.E. 98-12 at 3. Dr. Bray further opined:

> I feel Mr. May's failure to attend physical therapy directly contributes to his persistent complaints of loss of motion. I am unsure as to why the physical therapy ordered on September 29, 2020 was not slated to begin until November 5, 2020. I think that delay in starting physical therapy which was indeed refused would have slightly reduced the effectiveness of the therapy or perhaps would have caused the need for more prolonged therapy.

*Id.* at 4. The record indicates that Puckett referred May for physical therapy on October 12. D.E. 96 at 64. May has provided no evidence that any subsequent delay is attributable to Puckett. Dr. Bray's opinion indicates the entire delay from September 29 until November 5 ***would have*** slightly reduced the effectiveness of physical therapy or would have made it necessary for a longer period of time. It does not indicate that any delay actually caused a detrimental effect.

May also alleges the pain from his shoulder injury and poor treatment from Puckett caused him to suffer two heart attacks. However, May has provided no evidence to support this claim. May's medical records indicate that he complained of chest pain on August 14. D.E.

---

[6] May alleges that he spoke with "Physical Therapist Ms. Robin O'Bryan" on or about August 25, 2022, who told May that permanent injury could occur if physical therapy is not provided as directed. D.E. 101-1 at 4. However, no information is provided regarding the qualifications of Ms. O'Bryan, and this vague statement does not indicate whether any delay actually had a detrimental effect in May's case specifically.

14

101-28. At that time, an EKG was administered, and May was treated with "nitro" and "flexiril." *Id.* The summary of the visit was completed by Nurse Proffitt. *Id.* at 2. May alleges this document was also falsified by characterizing his symptoms as "muscle skeletal pain." D.E. 101 at 20, D.E. 101-28. Again, May has provided no evidence to support his claims that his medical records were falsified or that this incident was in any way related to his shoulder injury. *See Dennison v. Hardin Cnty. Det. Ctr.*, Civil Action No. 3:14-cv-P378-DJH, 2016 WL 742933, at *7 (W.D. Ky. Feb. 24, 2016) (finding that plaintiff failed to provide any medical evidence that his alleged stroke was caused by defendants' failure to provide pain medication). Nor has he provided any medical evidence that the care he received on August 14 was grossly inadequate.

To the extent May also alleges a distinct claim related to insufficient pain medication, this too fails. At a minimum, the record indicates Puckett prescribed May a 30-day supply of ibuprofen and 3-day supply of Tramadol and administered at least one pain injection during his first appointment with her on June 26. D.E. 100-3 at 52. On July 24 and August 7, May also received two canteen passes for ibuprofen and Tylenol. D.E. 101-17, 18. May has not provided any expert testimony or other verifying medical evidence that the medication he received was grossly inadequate.

May also repeatedly asserts that his shoulder injuries included a dislocation. However, none of the medical evidence in the record indicates that his shoulder was dislocated. Rather, May's records indicate he had a "fracture involving humeral head with *displacement*." D.E. 96 at 6; *see also* D.E. 96 at 7, 10. To the extent this displacement is what May refers to as a dislocation, he has still provided no expert testimony or verifying medical evidence that his treatment was grossly inadequate.

15

Similarly, May also alleges he broke his ribs in the fall and should have received additional treatment. May admitted to having broken his ribs multiple times in the past (D.E. 100-1 at 217-20) and even submitted medical records from April 2010 confirming he had "at least one healing rib fracture" (D.E. 101-14 at 5). The x-rays he received at UK HealthCare revealed healing and "chronic left rib fractures." D.E. 101-14 at 2. However, neither Dr. Primm or any of the other medical providers May saw for his injuries recommended any additional or specialized treatment for his ribs. Again, May has provided no medical evidence indicating his treatment was grossly inadequate.

May has failed to provide any expert testimony or other verifying medical evidence that the treatment provided to him was grossly inadequate. Accordingly, Puckett's summary judgment motion should be granted as to May's deliberate indifference claim.

## V. Official Capacity Claim

An "official capacity" claim against an employee is in actuality a claim against the agency that employs the individual. *Lambert v. Hartman*, 517 F.3d 433, 439-40 (6th Cir. 2008). May alleges that Puckett "is employed by WellPath Medical to provide medical treatment to inmates housed in state prisons in the Commonwealth of Kentucky through a contract with the Commonwealth of Kentucky." D.E. 56 at 11. WellPath can be considered a state actor for purposes of Section 1983 if its actions are "fairly attributable to the State." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). A private person or company may meet that test if it performs a function traditionally handled by the government, or if its actions are closely dictated by government rules. *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 752 (6th Cir. 2020). However, "without any evidence of such a constitutional violation, . . . [Plaintiff's] claim against this entity must fail too." *Phillips v. Tangilag*, 14 F.4th 524, 537 (6th Cir. 2021) (citing

*Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017)). Thus, because May's claims against Puckett in her individual capacity fail, so too must the official-capacity claims against her.

## VI. Conclusion

For these reasons, the undersigned **RECOMMENDS** that Defendant Puckett's motion for summary judgment (D.E. 97) be **GRANTED**.

The Court directs the parties to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. Within **fourteen days** after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 2nd day of March, 2023.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge