UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |  |
|---|---|---|
| JAMES R. MAY, | ) ) ) | |
|   Plaintiff, | ) | No. 5:21-CV-182-DCR-HAI |
| | ) | |
| v. | ) ) | RECOMMENDED DISPOSITION |
| DANIEL AKERS, *et al.*, | ) ) ) | |
|   Defendants. | ) ) | |

*** *** *** ***

*Pro se* Plaintiff James May is a prisoner at the Little Sandy Correctional Complex in Sandy Hook, Kentucky, but was formerly confined at the Lee Adjustment Center ("LAC") in Beattyville, Kentucky.  On June 29, 2021, the Clerk docketed a complaint by May against several staff members at LAC in their individual and official capacities.  D.E. 1.  On October 15, 2021, Chief Judge Reeves granted May's motion for leave to file an amended complaint.  D.E. 43.  On December 14, 2021, Chief Judge Reeves granted May's second motion to amend his complaint and granted the motion to dismiss claims against Defendant Brian Kendrick.  D.E. 55. As a result, May's Second Amended Complaint (D.E. 56) became the operative pleading in this matter and Kendrick was dismissed as a defendant in this action.  *Id.*

May brings a number of claims pursuant to 42 U.S.C. § 1983, as well as state law claims, all stemming from an incident that occurred on June 26, 2020, at the LAC when a chair May was sitting in allegedly collapsed and caused him to sustain injuries.  May's claims at issue at this time are:

(1)    An Eighth Amendment claim of deliberate indifference as to May's serious medical needs against Warden Akers, Assistant Warden Briggs, and Correctional Officer Crystal Justice.

(2)    An Eighth Amendment Claim for deliberate indifference to May's safety on account of their failure to warn or remove defective chairs against Defendants Akers, Briggs, Unit Manager Troy Wilson, Chief of Unit Management Ralph Clifton, and Correctional Officer Logan Williams.

(3)    A claim of civil conspiracy involving the destruction of the incident report written by Defendant Williams against Defendants Akers, Briggs, Wilson, Clifton, and Williams.

(4)    State law claims of negligence and gross negligence for failing to remove defective chairs, including the one that caused May's injuries, against Defendants Akers, Briggs, Wilson, Clifton, and Williams.

May was deposed on June 1 and 14, 2022, and the transcript is filed at Docket Entry 100. On November 14, 2022, Defendants Akers, Briggs, Wilson, Clifton, Williams and Justice filed a motion for summary judgment (D.E. 98). May responded (D.E. 104), and Defendants replied (D.E. 105). The briefing includes multiple attachments, such as affidavits and medical records. Defendants' motion for summary judgment stands ripe for review.

## I. Factual Background

On June 26, 2020, May was confined at the LAC. D.E. 100-1 at 8. Around 6:15 a.m., while using a kiosk in the canteen, the leg of the chair May was sitting in collapsed. *Id.* at 22. May landed on and injured his shoulder. *Id.* Shane Carroll and Lavon Stivers, also inmates at the LAC, were in the room with May when the chair collapsed. *Id.* at 61-62. May requested to

2

go to medical, but Defendant Justice instructed him to go to sick call when it began later that morning. *Id.* at 23. May, Carroll, and Stivers placed the collapsed chair in the office of Brian Kendrick, a program coordinator. *Id.* at 23-25.

May attended sick call when it began at about 7:00 a.m. D.E. 100-1 at 226, 100-3 at 54. May was first seen by Nurses Chaney and Freeman. D.E. 100-1 at 227-28, D.E. 100-3 at 54. They referred May to co-defendant Nurse Puckett for immediate evaluation. D.E. 100-1 at 229, D.E. 100-3 at 54. May was given an ice pack and sling for his shoulder. D.E. 100-1 at 238-39, D.E. 100-3 at 52, 54. May had taken 975 milligrams of Tylenol and 400 milligrams of ibuprofen prior to attending sick call. D.E. 100-3 at 52, 100-1 at 241-43. Puckett prescribed May a 30-day supply of ibuprofen and 3-day supply of Tramadol and administered at least one pain injection. D.E. 100-3 at 52. Puckett referred May for an x-ray as soon as possible and advised him to use ice packs and wear his sling at all times. D.E. 100-1 at 253, D.E. 100-3 at 52.

On the evening of June 26, Defendant Williams spoke with May and wrote a report summarizing the incident. D.E. 100-1 at 30-31.

May was seen again on July 1, 2020, by Puckett and an x-ray technician. D.E. 100-3 at 56. May reported "horrible" pain and difficulty dressing. *Id.* The x-ray technician "could not finish the study related to a fracture and the patient's inability to raise his arm." *Id.* This fracture was of the "humeral head with displacement." *Id.* May was not wearing his sling during the appointment. *Id.* The treatment notes from that visit indicate:

> Fracture seen on imaging per provider. Will consult Dr[.] Clifford for referral to orthopedics. Continue all other plan of care and medication at this time. Sling is to be worn at all times. Knock off for meal delivery given to patient. Refused to stay in medical at this time. Will follow up after consult. Consulted Dr[.] Clifford ok to send out for ortho referral and to exp[e]dite the consultation.

3

*Id.* The "knock off for meal delivery" allowed May's meal to be brought to his bed area. D.E. 100-1 at 265. On July 2, May refused to stay in the medical area for observation and assistance with activities of daily living. D.E. 100-3 at 58. The refusal form states, "No treatment offered – same as in dorm. Only refusing bed at medical." D.E. 101-15.

On July 6, 2020, May was seen by Puckett regarding left shoulder pain. D.E. 96 at 9. May was not wearing his sling and Puckett advised him to wear it. *Id.* May again refused to stay in the medical department. *Id.*

May was then seen on July 7 by Dr. Primm at UK HealthCare. D.E. 100-3 at 61. At that time, Dr. Primm noted he anticipated "nonoperative management," provided May with a cuff-and-collar sling, and scheduled a follow-up appointment three weeks later. *Id.* at 62.

On July 7, May returned to the medical department requesting that his meals be delivered and for a uniform pass to wear sweatpants. D.E. 96 at 13. Nurse Craft consulted Puckett, who granted the meal delivery request, but denied the uniform pass. *Id.* May was scheduled for a follow-up appointment with Puckett a week later. *Id.*

Puckett ordered ibuprofen and meloxicam for May on July 14. D.E. 96 at 14-15. On July 16, Puckett granted May's request to extend his meal deliveries and recommended continuation of his current care and medications. *Id.* at 16. Puckett noted May was not wearing his sling, and he reported that "the doctor told him not to wear it at all times because he did not want his muscles to freeze." *Id.*

May was seen again by Dr. Primm on August 4, 2020. D.E. 100-3 at 63. May reported improved, yet continued, pain his left shoulder and that he had "continued to perform range-of-motion exercises at the elbow and or shoulder." *Id.* May further reported that he had "minimal use of the cuff and collar sling" and that most of his pain occurred at night "when rolling over in

4

bed." *Id.* May denied "any numbness or tingling in the upper extremity" or any other complaints at that time. *Id.* May's left shoulder was x-rayed again, which demonstrated "continued callus formation and healing of the proximal humerus fracture with appropriate bony alignment." *Id.* Dr. Primm recommended Tylenol and ibuprofen for pain and continued various exercises for his shoulder and elbow. *Id.* A follow-up appointment was scheduled for six weeks later. *Id.*

On August 7, May submitted a request for additional medication and another extension to his meal deliveries. D.E. 96 at 20. May was seen on August 7 by Nurse Chaney, who prescribed ibuprofen and referred him to see Puckett. *Id.* at 63. On August 13, Puckett reported that May was again not wearing his sling and prescribed additional ibuprofen and extended his meal delivery by four more weeks. *Id.* at 21.

May was next seen by Dr. Primm on September 29, 2020. D.E. 96 at 23, D.E. 98-10 at 6, D.E. 100-1 at 296, 100-3 at 66. During that visit, May reported that his pain was much better and that he had continued range-of-motion exercises, though his left shoulder was still stiff. D.E. 98-10 at 6. Based on additional x-rays, Dr. Primm reported the fracture appeared healed. *Id.* Dr. Primm referred May for physical therapy, scheduled a follow-up appointment for six weeks later, and noted no additional x-rays would be needed. *Id.* Puckett referred May for physical therapy on October 12. D.E. 96 at 64.[1] On November 5, May refused to participate in physical therapy.[2] D.E. 96 at 65.

---

[1] During the deposition, counsel read this information from one of the September 29 medical records, and May confirmed its accuracy. D.E. 100-1 at 295-98. The deposition transcript indicates that this document was marked as Puckett Exhibit 8. *Id.* at 298. While Exhibit 8 is mostly illegible, this same document can be found in a more legible form on page 23 of Docket Entry 96. Exhibit 8 only includes findings from the September 29 x-rays, and does not include the information May reported to Dr. Primm. The Court's review of the record indicates that the medical document containing the information referred to as Exhibit 8 is located at Docket Entry 98-10 at 6.

[2] May asserts that the refusal form is fabricated. However, bare assertions and conclusory allegations that staff at the LAC fabricated medical records are insufficient to survive a motion for summary judgment. *Hood v. Moore*, Civil Action No. 18-124-GFVT-CJS, 2021 WL 5218535, at *13 (E.D. Ky. Aug. 20, 2021) (quoting *Arendale v. City*

May was transferred to the Southeast State Correctional Complex in January 2021 and then to the Little Sandy Correctional Complex in April 2022. *Id.* at 47, 66.

## II. Legal Standards—Summary Judgment

Defendants have moved for summary judgment under Rule 56 and rely upon documents and declarations extrinsic to the pleadings. Fed. R. Civ. P. 12(d). A motion under Rule 56 challenges the viability of the other party's claim by asserting that at least one essential element of that claim is not supported by legally sufficient evidence. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). If the moving party demonstrates that there is no genuine dispute as to any material fact and that he is entitled to a judgment as a matter of law, he is entitled to summary judgment. *Kand Med., Inc. v. Freund Med. Prods., Inc.*, 963 F.2d 125, 127 (6th Cir. 1992).

The moving party does not need his own evidence to support this assertion, but need only point to the absence of evidence to support the claim. *Turner v. City of Taylor*, 412 F.3d 629, 638 (6th Cir. 2005). The responding party cannot rely upon allegations in the pleadings, but must point to evidence of record in affidavits, depositions, and discovery which demonstrates that a factual question remains for trial. *Hunley v. DuPont Auto*, 341 F.3d 491, 496 (6th Cir. 2003). "A trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to 'wade through' the record for specific facts." *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).

The Court reviews all of the evidence presented by the parties in a light most favorable to the responding party and draws all reasonable factual inferences in his favor. *Harbin-Bey v.*

---

*of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008)) (However, "[i]n order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would [permit] a finding in [his] favor on more than speculation, conjecture, or fantasy.") (alteration in original), *report and recommendation adopted*, Civil No. 7:18-cv-124-GFVT-CJS, 2021 WL 4035004 (E.D. Ky. Sept. 3, 2021), *appeal dismissed*, No. 21-5912, 2022 WL 899295 (6th Cir. Jan. 5, 2022)

*Rutter*, 420 F.3d 571, 575 (6th Cir. 2005).  The Court must grant summary judgment if the evidence would not support a jury verdict for the responding party with respect to at least one essential element of his claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  If the applicable substantive law requires the responding party to meet a higher burden of proof, that party's evidence must be sufficient to sustain a jury's verdict in his favor in light of that heightened burden of proof at trial.  *Harvey v. Hollenback*, 113 F.3d 639, 642 (6th Cir. 1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993).

### III. Co-Defendant Puckett

As an initial matter, the undersigned addresses May's assertion that counsel for Defendants has attempted to assert arguments for co-defendant Puckett, who filed a separate motion for summary judgment.  May asserts that Defendants have made arguments for Puckett, which prejudices him.  D.E. 104 at 24.  However, Defendants' motion mentions Puckett because her actions are inextricably tied to them as to any medical negligence or malpractice claims against them.  This is because Puckett provided the underlying medical care, and May has previously asserted that Defendants are liable for Puckett's inadequate treatment.  The motions are separate and are separately addressed by the Court, but they contain factual overlap.  Addressing common facts when assessing distinct claims against distinct parties in no way prejudices May.

### IV. Dismissal of Defendant Crystal Justice

In his response, May "moves to dismiss the claims against Defendant Crystal Justice [because] a one[-]hour delay in receiving treatment does not constitute an 8th Amendment violation."  D.E. 104 at 2 n.1.  Defendants do not object to this request.  D.E. 105 at 1.

Accordingly, the undersigned recommends that May's claims against Defendant Justice be dismissed.

## V. Exhaustion

Defendants argue that May failed to exhaust available administrative remedies as to Akers, Wilson, and Clifton.  D.E. 98-1 at 5.  Exhaustion of administrative remedies is mandatory under the Prison Litigation Reform Act of 1995 ("PLRA") for any lawsuit challenging prison conditions.  *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).  "There is no question that . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).  It is not the prisoner's threshold burden to prove exhaustion; rather lack-of-exhaustion is an affirmative defense.  *Id.*  Once raised, the prisoner bears the burden of demonstrating proper exhaustion.  And summary judgment is appropriate if the defendant can establish the absence of a "genuine dispute as to any material fact" regarding non-exhaustion*.  Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

Prisoners must exhaust all "available" remedies—not just those that meet federal standards.  *Woodford*, 548 U.S. at 85.  "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require."  *Id.* at 87 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Id.* at 90-91.  It is the prison's requirements, not the PLRA, that define the boundaries of proper exhaustion.  *Jones*, 549 U.S. at 218.

Defendants attached the facility's grievance policy to their motion.  It requires that all individuals involved in an incident be identified at the first step of the grievance process.  D.E.

98-4 at 9.  At step one, after a grievance is filed, "an attempt to resolve the problem shall be made through informal means."  *Id.* at 10-11.  If an inmate is not satisfied with the informal resolution, he or she can request a hearing with the grievance committee, which will issue a written recommendation.  *Id.* at 11-12.  If an inmate is not satisfied with the committee's recommendation, it may be appealed to the Warden.  *Id.* at 13.  At this step, the Warden will examine the grievance and issue a written decision.  *Id.* at 14.  If the inmate is not satisfied with the Warden's decision, it may be appealed to the Commissioner.  *Id.*  At this final step, the Commissioner will review the appeal and issue a written decision.  *Id.*

A separate process exists for grievances related to health care.  First, attempts will be made to resolve the grievance informally.  *Id.* at 15-17.  If this cannot be accomplished, an inmate may request review by a healthcare grievance committee.  *Id.* at 17.  The committee will make a written recommendation, which an inmate can appeal for final administrative review.  *Id.* at 18.  If the committee's recommendation is appealed, the Medical Director will review the grievance and make a final decision.  *Id.*

Defendants argue that May failed to identify Akers, Clifton, or Wilson in his grievances, but do not contest exhaustion as to either Briggs or Williams.   Because failure to exhaust is an affirmative defense, the Court does not consider whether May failed to exhaust claims against either Briggs or Williams.

May filed a grievance on July 1, 2020, in which he requested $30,000 from "Core Civic and [each of] the employees who acted [with] deliberate indifferen[ce] by failing to warn [him] about the defective chairs."  D.E. 98-2 at 2.  The grievance describes the circumstances of his chair's collapse.  *Id.*  The Completion of Brief Statement of Problem form further indicates that Defendant Williams completed an incident report and told May that he had previously told "the

9

Warden" about "the bad chairs." *Id.* at 3. The form also states that Nurse Freeman told May that she had informed "the Warden and Core Civic staff" that the chairs were defective. *Id.*

The informal response to this grievance, written by Defendant Clifton, indicates that Williams reported he had not made the alleged statements to May. *Id.* at 2. Clifton also noted that the chairs are not defective and that "99.9% of injuries reported involving a chair [had] been [be]cause of misuse." *Id.* May appealed to the grievance committee, which concurred with the informal resolution. *Id.* at 4. May then appealed to the Warden and argued that Clifton's response at the informal resolution stage demonstrated that the LAC staff knew the chairs could collapse. *Id.* at 5. May also stated that he did not sit in the chair (or any other chair at any time) incorrectly and Williams had witnessed another inmate's chair collapse. *Id.* The Warden agreed with the informal resolution and noted that the chairs were not defective. *Id.* at 4. May then appealed this decision to the Commissioner, alleging that Clifton "falsely responded to the grievance to protect the LAC" and Defendant Wilson had removed collapsed chairs. *Id.* at 6. The Commissioner concurred with the prior decisions and noted that the chairs were not defective but may fail due to misuse. *Id.* at 7.

On July 2, 2020, May filed a healthcare grievance indicating that the medical treatment he received for his injuries from the chair collapse was inadequate. D.E. 98-3 at 3. The grievance indicates that he had informed four correctional officers about his injuries at the time they occurred. *Id.* The grievance also indicates that Defendant Justice was one of the officers May had spoken to and she ordered him to go to sick call. *Id.* The grievance also recounts the treatment he received from Nurse Puckett, which May alleged was inadequate. *Id.* at 4. The grievance also indicates that May informed "Warden Briggs" and other staff who are not parties in this matter that he needed hospital treatment, but received none. *Id.*

The informal resolution response notes the treatment May received for his injuries and that he was seen not wearing his sling multiple and refused to stay in the medical department multiple times.  *Id.* at 3.  May appealed, noting the treatment he felt was inadequate and referencing the same parties he named in the initial healthcare grievance.  *Id.* at 6-7.  The healthcare committee concurred with the informal resolution.  *Id.* at 8.  May appealed for final administrative review, which resulted in a decision concurring with the healthcare committee's recommendation.  *Id.*

May concedes that he failed to name all Defendants in his grievances, but asserts that any exhaustion argument is waived by Defendants' failure to raise the issue at the time the grievances were filed and proceeding to address the grievances on the merits.  D.E. 104 at 5-6.  In support of his argument, May cites to *Reed-Bey v. Pramstaller*, 603 F.3d 322 (6th Cir. 2010).  *Id.* at 6.  In *Reed-Bey*, the Sixth Circuit held, "When prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will we."  *Reed-Bey* 603 F.3d at 325.  However, the plaintiff in *Reed-Bey* failed to name ***anyone*** in his grievance.  *Id.* at 324.  Conversely, May's grievances named some, but not all, Defendants.

May also cites to *Mattox v. Edelman*, 851 F.3d 583, 591 (6th Cir. 2017) and *Does 8-10 v. Snyder*, 945 F.3d 951 (6th Cir. 2019).  D.E. 104 at 6.  In *Mattox*, the Sixth Circuit held that plaintiffs may amend their complaint to add newly exhausted claims where "a proper federal lawsuit has been filed as to other claims."  *Mattox*, 851 F.3d at 592.  This scenario is not present here.  The Sixth Circuit also reversed the district court's finding that certain claims were unexhausted where the relevant grievance referred to a single, unnamed "RMO" that contributed to the plaintiff's medication denial, clarified the RMO's name at the step two appeal, and prison

officials addressed the grievance on the merits. *Id.* at 588, 597. Thus, the defect in the grievance in *Mattox* was apparent at the initial step, but the prison officials still addressed it on the merits. Conversely, as will be further discussed, May's grievances mentioned certain prison officials by name or title and failed to mention others.

In *Snyder*, the defendants argued that the plaintiffs were required to exhaust their administrative remedies through the available general grievance process, but had instead filed their grievances through a separate process related to the Prison Rape Elimination Act ("PREA"). *Snyder*, 945 F.3d at 955, 957-62. However, the Sixth Circuit held that, because the defendants had treated the grievances as properly falling under the PREA process, so would the Court. *Id.* at 961-62. This holding is of no consequence to the current matter. The issue raised as to May's grievances is who he named, not what process he utilized.

In his July 1, 2020 initial grievance, which asserts a claim of deliberate indifference to his safety, May specifically named Justice, Williams, and "the Warden," but not Wilson or Clifton by name. D.E. 98-2 at 2-3. This grievance also refers to "Core Civic staff." *Id.* at 3. However, this vague reference is insufficient to indicate that either Wilson or Clifton knew about any defective chairs and could encompass nearly the entire prison staff. *See King v. Banks*, No. 2:10-CV-852, 2012 WL 1068103, at *4 (S.D. Ohio Mar. 29, 2012), *report and recommendation adopted sub nom. King v. Edward Banks*, No. 2:10-CV-852, 2012 WL 2891264 (S.D. Ohio July 13, 2012) (holding that plaintiff's references to the "administration" and "the institution" in his grievance were insufficient to name and exhaust claims against a deputy warden). Further, although Clifton was mentioned in the appeal to the Warden (D.E. 98-2 at 5) and both he and Wilson were mentioned in the appeal to the Commissioner (*id.* at 6), this is insufficient for exhaustion. *McDonald v. Green River Corr. Complex*, No. 4:17-CV-P138-JHM, 2020 WL

12

5237520, at *3 (W.D. Ky. Sept. 2, 2020) (finding plaintiff failed to exhaust claims against defendants where they were only named in the appeals process rather than at step one). May was required to name Wilson and Clifton at step one of the grievance process to exhaust his claims of deliberate indifference as to his safety against them. Because he did not do so, May's claims that Wilson and Clifton were deliberately indifferent to his safety must be dismissed.

As to Warden Akers, "[w]here a prisoner fails to identify a prison official by name, his grievance can still fulfill the purposes of exhaustion by the inclusion of other information identifying the official, such as the official's title or position or even the facts set forth in the grievance." *Nettles v. Edgar*, No. 1:22-CV-119, 2022 WL 16556063, at *6 (W.D. Mich. Sept. 22, 2022) (citing cases), *report and recommendation adopted*, No. 1:22-CV-119, 2022 WL 16551462 (W.D. Mich. Oct. 31, 2022). Including "the Warden" in his July 1 grievance was sufficient to identify Warden Akers and exhaust May's claims related to the chairs at the LAC against Akers. D.E. 98-2 at 2; *Reed-Bey*, 603 F.3d at 324 ("The point of the PLRA exhaustion requirement is to allow prison officials 'a fair opportunity' to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court."). May specifically noted in the Completion of Brief Statement of Problem form attached to his July 1 initial grievance that Defendant Williams and Nurse Freeman had previously told the Warden about the defective chairs. D.E. 98-2 at 3. Thus, Defendants' argument that May made "no complaints against Warden Akers" is inaccurate. D.E. 98-1 at 6. May sufficiently identified Warden Akers in the grievance and exhausted his deliberate indifference claim regarding his safety against him.

In the initial grievance from July 2, 2020, related to his medical care, May named only Justice, Briggs, and other non-party staff members (as well as Puckett, but May's claims against

13

her have already been addressed by the Court at Docket Entry 111).  D.E. 98-3 at 3-4.  No reference is made to Warden Akers, Clifton, or Wilson.  *See Id.*  As a result, May's Eighth Amendment deliberate indifference claims as to his medical care are unexhausted as to Defendants Wilson, Clifton, and Akers.  Thus, those claims should also be dismissed.

"When a prisoner complaint contains both exhausted and unexhausted claims, the lower courts should not dismiss the entire 'mixed' complaint, but are required to dismiss the unexhausted claims and proceed to address only the exhausted claims."  *Petty v. Rush*, Civil No. 08-159-GFVT, 2010 WL 1796573, at *4 (E.D. Ky. May 4, 2010) (citing *Jones v. Bock*, 549 U.S. 199, 219-224 (2007)).  For these reasons, May's claims of deliberate indifference to his safety against Defendants Wilson and Clifton and his claims of deliberate indifference to his serious medical needs against Defendants Wilson, Clifton, and Akers are all unexhausted and should be dismissed.  However, contrary to Defendants' assertions, May exhausted his claim of deliberate indifference to his safety against Warden Akers.  Thus, May's remaining claims are:

1. An Eighth Amendment claim of deliberate indifference as to May's serious medical needs against Briggs.

2. An Eighth Amendment Claim for deliberate indifference to May's safety on account of their failure to warn or remove defective chairs against Defendants Akers, Briggs, and Williams.

3. A claim of civil conspiracy involving the destruction of the incident report written by Defendant Williams against Defendants Akers, Briggs, Wilson, Clifton, and Williams.

4. State law claims of negligence and gross negligence against Defendants Akers, Briggs, Wilson, Clifton, and Williams.

## VI. Deliberate Indifference to Serious Medical Needs

The Eighth Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward [his] serious medical needs." *Blackmore v. Kalamazoo County*, 390 F. 3d 890, 895 (6th Cir. 2004) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  A plaintiff asserting deliberate indifference to his serious medical needs must establish both the objective and subjective components of such a claim. *Jones v. Muskegon Co.*, 625 F.3d 935, 941 (6th Cir. 2010).  The objective component requires the plaintiff to show that the medical condition is "sufficiently serious," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), such as one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citations omitted). The subjective component requires the plaintiff to show that prison officials actually knew of a substantial risk of harm to the plaintiff's health but consciously disregarded it.  *Cooper v. County of Washtenaw*, 222 F. App'x 459, 466 (6th Cir. 2007); *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994).

Where, as here, a prisoner receives treatment and challenges its adequacy, a heightened showing must be made that the treatment was "'so grossly incompetent' or so grossly 'inadequate' as to 'shock the conscience' or [would] 'be intolerable to fundamental fairness.'" *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)).  "For prisoners to prove grossly inadequate care, moreover, courts generally require them to introduce medical evidence, typically in the form of expert testimony."  *Id.* (citing *Rhinehart*, 894 F.3d at 737, 740-43; *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)).  Similarly, where there is a delay in care, a plaintiff "need[s] to 'place verifying medical

evidence in the record to establish the detrimental effect of the delay in medical treatment.'" *Id.* at 538 (quoting *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)).

It is unclear whether May asserts any medical-related Eighth Amendment claims against Defendants Akers, Briggs, Clifton, Wilson, or Williams.  His Second Amended Complaint refers to co-defendant Puckett in relation to such claims.  D.E. 56.  However, May asserted in his deposition that Akers and Briggs may have impeded or ignored his medical requests.  D.E. 100-1 at 96-99, 132-33.  May made no such claims against Clifton, Wilson, or Williams.  Thus, at best, May has asserted claims of deliberate indifference as to his serious medical needs against Akers and Briggs.  As previously discussed, any Eighth Amendment claims regarding May's medical care against Akers are unexhausted.  And, even if May intends to assert a medical deliberate indifference claim against Briggs, it also fails.  The undersigned incorporates by reference the portion of the Recommended Disposition at Docket Entry 111 regarding May's deliberate indifference claim of his serious medical needs against co-defendant Puckett.  D.E. 111 at 8-16.  As discussed therein, because May received treatment for his injuries, he is required to provide expert testimony to show that he received grossly inadequate care.  *See Phillips*, 14 F.4th at 535 (quoting *Rhinehart*, 894 F.3d at 737).   However, he has not provided this evidence.  Thus, his claims of deliberate indifference to his serious medical needs must fail.

Further, Defendant Briggs is not a medical provider.  And "[i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  *Smith v. Cnty. of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012) (alterations in original) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).  "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable

with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* (alterations in original) (quoting *Spruill*, 372 F.3d at 236)).   May cites to the affidavit of Shane Carroll, which states that two non-medical staff allegedly told Briggs that May needed medical attention on July 2, 2020.  D.E. 104 at 8, D.E. 104-3 at 2.   However, May refused to stay in the medical area on July 2 for observation and assistance with activities of daily living.  D.E. 100-3 at 58.   The refusal form states, "No treatment offered – same as in dorm.  Only refusing bed at medical." D.E. 101-15.  May had been receiving care and continued to receive medical treatment after July 2.  Because May was under the care of medical experts, Briggs was justified in believing he was in capable hands.  Indeed, the recommended disposition for co-defendant Puckett's motion for summary judgment includes a finding that no medical deliberate indifference or medical malpractice claims has been proven, which further supports that Briggs was justified in reserving treatment decisions to the LAC medical staff.   For these reasons, Defendant Briggs is entitled to judgment as a matter of law as to any claim of deliberate indifference to May's medical needs.[3]

## VII. State Law Claims

### A.  Medical Malpractice

Under Kentucky negligence law, including medical negligence, the Plaintiff must establish the following elements: (1) a duty of care; (2) breach of that duty; (3) actual injury, and (4) the injury was proximately caused by the negligence.  *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 687-88 (Ky. 2003), *as amended* (Aug. 27, 2003); *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1997).

---

[3] Even if the medical deliberate indifference claim against Akers was exhausted or May intended to bring claims against Clifton, Wilson, or Williams, these Defendants would also be entitled to summary judgment on those claims, because he has not provided any expert evidence that he received grossly inadequate care.  Further, like Briggs, Akers, Clifton, Williams, and Wilson are not medical providers and May was receiving care from medical professionals at the LAC.  Thus, these Defendants would also be justified in believing he was in capable hands. *Smith*, 505 F. App'x at 532 (quoting *Spruill*, 372 F.3d at 236).

"[T]he plaintiff in a medical negligence case is required to present expert testimony that establishes (1) the standard of skill expected of a reasonably competent medical practitioner and (2) that the alleged negligence proximately caused the injury." *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006). The expert's opinion must be based "on reasonable medical probability and not speculation or possibility." *Sakler v. Anesthesiology Associates, P.S.C.*, 50 S.W.3d 210, 213 (Ky. Ct. App. 2001).

To be clear, meeting this standard requires that the expert establish the applicable standard of care. "To establish a prima facie case of medical malpractice, a plaintiff must introduce evidence, *in the form of expert testimony*, demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant . . . ." *Sandler v. United States*, No. 6:11-CV-206-GFVT, 2013 WL 5468493, at *6 (E.D. Ky. Sept. 30, 2013) (quoting *Heavrin v. Jones*, No. 02-CA-16-MR, 2003 WL 21673958, at * 1 (Ky. Ct. App. July 18, 2003)). "It is the Plaintiff's burden to find a doctor who will testify to the standard of treatment of each condition and testify that in his or her expert opinion, the standard was breached by the federal employee(s) in this case." *Id.* (quoting *Hernandez v. United States,* No. 5:08-CV-195-KSF, 2009 WL 1586809, at *6 (E.D. Ky. June 5, 2009)).[4]

Defendants argue that, to the extent alleged, any medical malpractice claims against them fail. May does not address any potential medical malpractice claims against Defendants in his

---

[4] *See also Partin v. Tilford*, No. 5:13-CV-193-CRS, 2016 WL 3212248, at *2 (W.D. Ky. June 7, 2016) (granting summary judgment when plaintiff failed to establish "what a proper [treatment] entails"); *Smith v. Rees*, No. 5:07-CV-180-TBR, 2011 WL 3236635, at *3 (W.D. Ky. July 28, 2011) (requiring expert testimony to establish the standard of care); *Beard v. United States*, No. 5:08-CV-105-KSF, 2009 WL 305893, at *7-9 (E.D. Ky. Feb. 6, 2009) (granting summary judgment when plaintiff offered no expert proof establishing the standard of care); *Hitch v. St. Elizabeth Med. Ctr., Inc.*, No. 2014-CA-1361-MR, 2016 WL 1557734, at *2 (Ky. Ct. App. Apr. 15, 2016) (granting summary judgment when the expert "made no statement to indicate what the standard of care is"); *Tackett v. Appalachian Reg'l Healthcare, Inc.*, No. 2007-CA-720-MR, 2008 WL 2779528, at *2-4 (Ky. Ct. App. July 18, 2008) (granting summary judgment when the plaintiff's expert "failed to produce evidence as to the medical standard of care at issue").

response.  Nor does he address the expert testimony requirement for such a claim.  May has presented no expert testimony, as required by Kentucky law, to establish either the applicable standard of care or that it was breached.  Thus, to the extent any medical malpractice claims are alleged against Defendants Akers, Briggs, Clifton, Wilson, or Williams, they are entitled to judgment as a matter of law on these claims.

### B.  Negligence and Gross Negligence

Again, for a negligence claim under Kentucky law, May must establish the following elements: "(1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages."  *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016) (citing *Pathways, Inc., v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003)).

"Duty presents a question of law, whereas breach and injury are questions of fact for the jury to decide."  *Id.* (citing *Pathways, Inc.*, 113 S.W.3d at 88).  As to duty in the prison context, "the keeper of the prison must exercise ordinary care for the protection of his prisoner if there is reasonable ground to apprehend the danger to the prisoner."  *Commonwealth v. Russell*, 578 S.W.3d 747, 751 (Ky. Ct. App. 2019) (quoting *Bartlett v. Commonwealth*, 418 S.W.2d 225 (Ky. 1967)).  This duty is based on the "special relationship" that exists when "(1) the victim is either in state custody or otherwise restrained by the state when the injury occurred and (2) the negligent conduct was committed by a state actor."  *Russell*, 578 S.W.3d at 752 (*Collins v. Commonwealth Transportation Cabinet, Dep't of Highways*, 516 S.W.3d 320, 324 (Ky. 2017)).  Further, foreseeability of harm "does not create a duty," and "arises only after the establishment of the existence of a duty."  *City of Florence, Kentucky v. Chipman*, 38 S.W.3d 387, 393 (Ky. 2001), *as amended* (Feb. 26, 2001).

"[C]ausation presents a mixed question of law and fact." *Pathways, Inc.*, 113 S.W.3d at 89) (citing *Deutsch v. Shein, Ky.*, 597 S.W.2d 141, 145 (Ky. 1980)).  Causation has two prongs, but-for causation and proximate cause.  *Howard v. Spradlin*, 562 S.W.3d 281, 287 (Ky. Ct. App. 2018).  "But-for causation requires the existence of a direct, distinct, and identifiable nexus between the defendant's breach of duty (negligence) and the plaintiff's damages such that the event would not have occurred 'but for' the defendant's negligent or wrongful conduct in breach of a duty."  *Patton v. Bickford*, 529 S.W.3d 717, 730 (Ky. 2016).  As to proximate cause, this prong "captures the notion that, although conduct in breach of an established duty may be an actual but-for cause of the plaintiff's damages, it is nevertheless too attenuated from the damages in time, place, or foreseeability to reasonably impose liability upon the defendant."  *Id.* at 731.

A risk "must be foreseeable based on what the tortfeasor knew or should have known at the time of the accident rather than what might be deemed foreseeable in hindsight."  *Stiens v. Bausch & Lomb Inc.*, 626 S.W.3d 191, 200 (Ky. Ct. App. 2020) (citing *Bruck v. Thompson*, 131 S.W.3d 764, 767 (Ky. App. 2004)).  Further, the precise form of injury need not be foreseeable.  *Id.*  Rather, "it is sufficient if the probability of injury of some kind to persons within the natural range of effect of the alleged negligent act could be foreseen."  *Id.*  (quoting *Isaacs v. Smith*, 5 S.W.3d 500, 502 (Ky. 1999)).

May alleges that Defendants knew of other chairs collapsing that resulted in injury prior to June 26, 2020, but failed to inspect or remove them.  D.E. 56 at 18-19.  May asserts that Defendants' failure to inspect or remove defective chairs caused his injuries.  *Id.*  Defendants argue that May's injuries were not foreseeable and his chair's failure was caused by misuse rather than any defect.  D.E. 98-1 at 28-29.  As to causation, even assuming reports were made to Defendants that some chairs had collapsed while other inmates or staff members were sitting in

them but the chairs were not removed, May has not provided any evidence, lay or expert, to explain the cause of his specific chair's collapse.

On the other hand, Defendants have provided expert evidence through the report from Dr. Russell Dunn, Ph.D., P.E. D.E. 98-18.  Dr. Dunn is a chemical engineer with a focus on "process and product design issues, process and product safety and polymer product analysis."  *Id.* at 2.  Dr. Dunn analyzed May's chair to determine the cause of its failure.  *Id.* at 9.  Dr. Dunn's testing included visual examination, dimensional analysis, and microscopic examination of May's chair and an "exemplar" chair of the same model.  *Id.* at 9-11.  Dr. Dunn observed that the left rear leg of May's chair was bent and deformed.  *Id.* at 12.  Dr. Dunn's report concludes that "[t]he root cause of failure of the subject chair is overload failure from unintended use where the vast majority of the stress on the subject chair was exerted on the left rear leg and was clearly not evenly distributed on four legs."  *Id.* at 15.

Moreover, Applied Technical Services tested two other chairs that had been at the LAC for the same amount of time as May's chair and were all the same model and age.  D.E. 98-1 at 29-30, 98-18 at 11, 55-62.  Both chairs passed standard ASTM 1561-94 standard load, rear leg, and impact testing without failure.  D.E. 98-18 at 11, 55-62.

May has not provided any evidence, expert or otherwise, to prove that the chair collapsed due to any defect.  This dooms May's negligence-based claims because he "cannot simply claim some mercurial defect existed without expert support to create a genuine issue of material fact." *Snider v. Wal-Mart Stores, Inc.*, Civil Action No. 1:14-CV-00097-GNS-HBB, 2016 WL 319878, at *4 (W.D. Ky. Jan. 26, 2016), *aff'd*, 664 F. App'x 463 (6th Cir. 2016) (citing *Williams v. Toyota Motor Sales, U.S.A.*, No. 2:11-38-DCR, 2012 WL 176473, at *3-5 (E.D. Ky. Jan. 20, 2012)). "Kentucky law generally requires expert testimony as to the standard of care and causation

elements in negligence cases, that requirement is only applicable if the negligence is not 'so apparent that a layperson would recognize it.'" *Leveline v. Schindler Elevator Corp.*, Civil Action No. 21-33-DLB-CJS, 2022 WL 4474247, at *2 (E.D. Ky. Sept. 26, 2022) (quoting *Eberhardt v. United States*, No. 3:15-CV-63, 2017 WL 653273, at *6 (W.D. Ky. Feb. 16, 2017)).

While a collapsing chair may not seem hyper technical in nature, May has alleged that his chair had a defect that caused it to collapse. Yet May has testified that the chair was not obviously defective or dangerous when he sat in it. D.E. 100-1 at 66-67, 73-74. May has submitted the affidavit of Shane Carroll, which indicates he was in the room with May and another inmate when "the chair James May was sitting in collapsed (left leg) and he fell to the floor." D.E. 104-3 at 2. However, neither May nor Carroll claims to have seen any apparent defect or what otherwise caused the chair to collapse. *See Leveline*, 2022 WL 4474247, at *2 ("[Plaintiff] is a lay person and she—as someone who experienced the fall—could not recognize the negligence that took place, which further proves the need for expert testimony as to the standard of care and causation of her injury."). The alleged negligence was not so apparent that a layperson would or should have recognized it. At best, May has claimed that his chair may have been defective due to age based on alleged speculative statements by non-parties that the chairs are old and dangerous. D.E. 104-3 at 7, 9, 11. But, May cannot rely solely on his own unsupported, self-serving allegations to defeat a motion for summary judgment. *Spigelman v. Samuels*, No. 13-CV-074-GFVT, 2015 WL 1411942, at *6 (E.D. Ky. Mar. 26, 2015) (citing *Garvey v. Montgomery*, 128 F. App'x 453, 462 n.6 (6th Cir. 2005); *Wolfe v. Village of Bice, Ohio*, 37 F. Supp.2d 1021, 1026 (S.D. Ohio (1999)).

Defendants rely upon expert analysis that the chair's failure was due to misuse, not age or any defect. Although May testified that he was not leaning back in the chair during the time of

the incident (D.E. 100-1 at 67-68), Dr. Dunn's report concludes that the chair failed due to the vast majority of stress not being evenly distributed (D.E. 98-18 at 15).  Rather than putting forth his own expert evidence, May asserts there are multiple issues with Dr. Dunn's report.  First, May states that any opinion that the chair collapsed due to an overload failure "cannot be true because [he] only weighed about 200lbs when the incident occurred."  D.E. 104 at 18.  May appears to misinterpret Dr. Dunn's opinion to mean that his weight alone caused the chair's failure.  However, Dr. Dunn actually concluded that the chair failed due to "the vast majority of the stress on the subject chair [being] exerted on the left rear leg and was clearly not distributed on all four legs."  D.E. 98-18 at 15.

Next, May argues that the report "must fail" because the age of the chair was not taken into consideration.  D.E. 104 at 19.  However, as Defendants point out, Dr. Dunn specifically concluded that "[t]he anticipated oxidative degradation of the outer surface of the rear leg did not sufficiently weaken [] the leg to cause failure, as evidenced by ductile bending as opposed to brittle fracture."  D.E. 98-18 at 14.  Dr. Dunn's report also confirms that the chair was manufactured in 1996.  *Id.* at 12.  Despite its age, Dr. Dunn still concluded that the root cause of failure was from misuse.  *Id.* at 14-15.

May also argues that Dr. Dunn has failed to explain how other chairs allegedly collapsed at the LAC.  D.E. 104 at 19.  However, Dr. Dunn was not tasked with analyzing any other collapsed chairs at the LAC, nor is such an analysis relevant given the conclusion that May's chair collapsed due to misuse.  May also argues his chair was further damaged after June 26 and this negates any findings by Dr. Dunn.  D.E. 104 at 19 n.8.  But, again, Dr. Dunn specifically noted additional damage had occurred to the chair prior to his receipt of it on August 1, 2022.  D.E. 98-18 at 9, 13.  Dr. Dunn noted that additional damage was apparent at the front and top of

the chair seat, but the left rear leg was in the same condition. *Id.* at 9. Still, even taking this post-incident damage into account, he concluded that the chair failure resulted from misuse.

May also argues that the chair examined by Dr. Dunn is not the same chair that collapsed while he was sitting in it. D.E. 104 at 19. He asserts that "JPAY ROOM ONLY" was written on the back of his chair, which is not written on the back of the chair tested by Dr. Dunn. *Id.* During his deposition, May was asked to confirm whether Exhibit 7 was a photograph of the chair he was using on June 26. D.E. 100-1 at 310. May responded, "Yes, if that chair came out of Brian Kendrick's office, that's the chair I fell out of." *Id.* This is the same photograph provided to Dr. Dunn and included in his report. *Compare* D.E. 100-3 at 51 *with* 98-18 at 17.

Defendants also attached to their reply affidavits of Brian Kendrick, Mitchell Brandenburg, and Phillip Becknell confirming the chain of custody of May's chair. D.E. 105-1, 2. Kendrick confirms that the chair was given to him from May on June 26, 2020, and maintained in his office until he gave it to Brandenburg, the Quality Assurance Manager of Lee Adjustment Center, to be kept as evidence. D.E. 105-1 at 2. Photographs of the chair are attached to Kendrick's affidavit, which include the one shown to May during his deposition and included in Dr. Dunn's report. *Compare* D.E. 105-1 at 4-11 *with* D.E. 100-3 at 51 *and* 98-18 at 17-18.

Brandenburg confirms that he kept the chair in his control until the chair was sent for testing by experts selected by Defendants. *Id.* at 12. "JPAY ROOM ONLY" is not marked on the chair in the photographs that was transferred from Kendrick's office, and Brandenburg states that he does not recall ever seeing the phrase written on any of the chairs at the LAC. *Id.* at 12. Brandenburg's affidavit also indicates that he transferred the chair to Phillip Becknell, who delivered the chair to Defendants' counsel. *Id.* Becknell confirms that he transported the chair

24

to defense counsel and also notes that the additional damage to the top of the chair likely occurred during transportation. D.E. 105-2. The Evidence Transfer Form attached to Defendants' reply indicates the chair was transferred to Dr. Dunn on August 1, 2022. D.E. 105-1 at 14. Thus, the evidence clearly indicates that the chair analyzed by Dr. Dunn was the chair May was sitting in on June 26, 2020, that collapsed. May's vague assertions to the contrary do not create a genuine issue of material fact.

May also alleges that Defendants were negligent per se for failing to follow the incident reporting requirements in Corrections Policy and Procedure 8.6. D.E. 104 at 23. May asserts that Defendants violated this policy by failing to create incident reports for the other inmates harmed by collapsed chairs. *Id.* at 11-12. May cites to *Britton v. Wooten*, 817 S.W.2d 443 (Ky. 1991), in support of this argument, but his reliance on this case is misplaced. There, the Supreme Court of Kentucky explained that "violations of administrative regulations, like statutory violations, constitute negligence, per se, and the basis for liability ***if found to be a substantial factor in causing the result***." *Britton*, 817 S.W.2d at 447 (emphasis added) (citing cases). Even assuming Defendants did not report instances of chair failures from defects, May has not shown that ***his*** chair failed due to a defect. In turn, he has not shown that any alleged failure to report any chair failure from a defect by Defendants was a substantial factor in causing his fall. May has failed to show that any failure to report by Defendants caused him any injury.

May's claims of gross negligence also fail. Under Kentucky law, "[e]stablishing gross negligence requires 'something more than the failure to exercise slight care.'" *Moore v. Zydus Pharms. (USA), Inc.*, 277 F. Supp. 3d 873, 882 (E.D. Ky. 2017) (quoting *City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001)) "Gross negligence means a 'wanton or reckless disregard for the lives, safety, or property of others.'" *Saint Joseph Healthcare, Inc. v. Thomas*,

487 S.W.3d 864, 870 (Ky. 2016) (quoting *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky. 2013)).  May has failed to show that Defendants were negligent, let alone that they were grossly so.

May "cannot simply claim some mercurial defect existed without expert support to create a genuine issue of material fact."  *Snider*, 2016 WL 319878, at *4 (citing *Williams*, 2012 WL 176473, at *3-5).  May has failed to create any genuine issue of material fact that his chair collapsed due to any defect.  Thus, Defendants Akers, Briggs, Clifton, Wilson, and Williams are entitled to summary judgment as a matter of law on this claim.

## VIII.  Deliberate Indifference to Safety

"The Eighth Amendment protects prisoners only from that conduct which is 'repugnant to the conscience of mankind.'"  *Rafferty v. Trumbull Cty., Ohio*, 915 F.3d 1087, 1094 (6th Cir. 2019) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010)).  Only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.  *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Again, a deliberate indifference claim contains both an objective and a subjective component.  To show that the alleged mistreatment was objectively "sufficiently serious," the plaintiff must show he is incarcerated under conditions posing a substantial risk of serious harm.  *Farmer*, 511 U.S. at 834; *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011).

The subjective component requires a showing that prison officials acted with "deliberate indifference" to inmate health or safety:

> An official is deliberately indifferent if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  [*Farmer*, 511 U.S. at 837.]  The Supreme Court has held that:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

> [*Id.* at 842.]  However, a prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it.

*Bishop*, 636 F.3d at 766-67.   Deliberate indifference is equivalent to criminal recklessness.

*Farmer*, 511 U.S. at 839-40.  The plaintiff "must demonstrate deliberateness tantamount to intent to punish."  *Horn by Parks v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).

As previously discussed, May's claims of deliberate indifference to his safety against Wilson and Clifton are unexhausted, and he has not established that Defendants Akers, Briggs, Clifton, Wilson, or Williams were negligent.  And "deliberate indifference describes a state of mind more blameworthy than negligence."  *Farmer*, 511 U.S. at 835.  If May cannot even establish negligence (for the reasons discussed above), he cannot establish deliberate indifference, which is a higher standard of culpability.  Because May's claim does not rise to the level of a constitutional violation, Defendants Akers, Briggs, and Williams are entitled to judgment as a matter of law.[5]

### IX. Civil Conspiracy

May also alleges Defendants Akers, Briggs, Clifton, Wilson, and Williams conspired to destroy Williams's report regarding the June 26 incident to attempt to violate his rights to access the courts.  In order to prevail on a § 1983 civil conspiracy claim, May must prove "(1) a 'single plan' existed, (2) [Defendants] 'shared in the general conspiratorial objective' to deprive [May] of his constitutional (or federal statutory) rights, and (3) 'an overt act was committed in

---

[5] Likewise, even if May's claims of deliberate indifference to his safety against Clifton and Wilson were exhausted, these Defendants would also be entitled to judgment as a matter of law because they do not rise to the level of a constitutional violation.

furtherance of the conspiracy that caused injury' to [May]." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). "Moreover, a plaintiff must allege facts showing not only an agreement by defendants to violate his or her constitutional rights, but also an actual deprivation of a constitutional right." *Perry v. Agric. Dep't*, Civil Action No. 6:14-168-DCR, 2015 WL 3674359, at *4 (E.D. Ky. June 12, 2015) (citing *Stone v. Holzberger*, 807 F. Supp. 1325, 1340 (S.D. Ohio 1992)).

May alleges that Defendants Akers, Briggs, Clifton, Wilson, and Williams worked together to destroy Williams's report regarding the June 26, 2020 incident.  In support of this allegation, May relies on his own affidavit, which indicates that Williams's report recommended the LAC "remove chairs" and Williams told May "he believed the administration got rid of his written report because 'it hung them out to dry,'" which May asserts meant "the warden." D.E. 104-2 at 1.  May testified during his deposition that Williams said he "would have gotten rid of it too."  D.E. 100-1 at 34.  Defendants acknowledge that Williams's report was written but now cannot be located.  D.E. 98-1 at 31.  Defendants attached the affidavit of Jordan Turner, the Records Clerk at the LAC, which indicates that Turner attempted to locate the report but was unsuccessful.  D.E. 98-20.  Williams's answers to May's interrogatories indicate that he does not know what happened to the report after he turned it into his supervisor on June 26.  D.E. 98-15 at 3.

Even assuming that Williams expressed his belief that the report was destroyed as alleged by May, these statements do not indicate that Williams or anyone specifically identified took part in its destruction.  May's affidavit indicates his interpretation of Williams's statements that "the administration got rid of his report" because "it hung them out to dry" references "the warden." D.E. 104-2 at 1.  May offers no evidence as to who was involved, and May's own interpretation

indicates Warden Akers was referenced, not Briggs, Williams, Clifton, or Wilson.  However, Akers cannot have conspired by himself.  *Hooks*, 771 F.2d at 943–44 ("A civil conspiracy is an agreement between **two or more persons** to injure another by unlawful action.").

In any event, May's claim fails because he cannot prove injury.  At best, May argues that the report included a recommendation that chairs be removed from the LAC and indicated Defendants had knowledge that some chairs were faulty.  However, because May has failed to prove Defendants were deliberately indifferent to his safety or even negligent, he likewise cannot prove any injury from the report's destruction.  May "cannot succeed on a conspiracy claim because there was no underlying constitutional violation that injured [him]."  *Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009) (citing *Plymouth v. Twp.*, 233 F. App'x. 490, 500 (6th Cir. 2007)).   Accordingly, Defendants Akers, Briggs, Clifton, Wilson, and Williams are entitled to judgment as a matter of law.

## X. Official Capacity Claims

An "official capacity" claim against an employee is actually claim against the employer of the individual.  *Lambert v. Hartman*, 517 F.3d 433, 439-40 (6th Cir. 2008).  "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Hopper v. Phil Plummer*, 887 F.3d 744, 760 n.4 (6th Cir. 2018) (alteration in original) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)); *see also Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)).  "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Monell*, 436 U.S. at 691.  A plaintiff must show that the entity's policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983."

*Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)).

Defendants argue that May has not raised any official capacity claims against them, because their employer CoreCivic, Inc., is not a named party. D.E. 98-1 at 33. Defendants also state that May has not tied the alleged claims to any CoreCivic policy or custom. *Id.* May's response includes general argument that Defendants violated the Corrections Policy and Procedure 8.6 by failing to report instances of chair failures. D.E. 104 at 11-12. May does not explain how any of his constitutional claims are founded upon any policy or custom so as to fall within *Monell*.

Thus, "without any evidence of such a constitutional violation, . . . [Plaintiff's] claim against this entity must fail too." *Phillips v. Tangilag*, 14 F.4th 524, 537 (6th Cir. 2021) (citing *Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017)). Thus, because May's claims against Defendants Akers, Briggs, Clifton, Wilson, and Williams in their individual capacity fail, this provides an additional basis why any official-capacity claims against them must also fail.

## XI. Punitive Damages

"Punitive damages for deprivation of civil rights may be awarded when the defendant wil[l]fully and intentionally violates another's civil rights or when the defendant acts with reckless or callous indifference to the federally protected rights of others." *Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir. 1986) (citing *Smith v. Wade*, 461 U.S. 30 (1983)). "In Kentucky, 'the well established common law standard for awarding punitive damages was [and is] gross negligence.'" *Crowe v. Johnson*, 377 F. Supp. 3d 713, 721 (E.D. Ky. 2019) (alteration in original) (quoting *Kinney v. Butcher*, 131 S.W.3d 357, 358-59 (Ky. Ct. App. 2004)). As discussed above, May has failed to provide sufficient evidence to support a claim of negligence,

let alone gross negligence or any willful and intentional constitutional violation. Accordingly, Defendants Akers, Briggs, Clifton, Wilson, and Williams are also entitled to judgment as a matter of law on May's punitive damage claims.

## XII. Conclusion

The undersigned recommends that Defendants' motion for summary judgment (D.E. 98) and May's motion to dismiss the claims against Crystal Justice be **GRANTED**.

The Court directs the parties to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. Within **fourteen days** after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 22nd day of March, 2023.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge